# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| KATHRYN MEGONNELL, | : | |
| | : | |
| Plaintiff | : | Civil Action No. 1:07-cv-02339 |
| | : | (Chief Judge Kane) |
| v. | : | |
| | : | |
| INFOTECH SOLUTIONS, INC. t/d/b/a | : | |
| AVYSION IT and/or AVYSION | : | |
| HEALTHCARE SERVICES, PAMELA | : | |
| HUNTER AND LEONARD TOKAR, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Pending before the Court are cross-motions for summary judgment by Plaintiff Kathryn

Megonnell (Doc. No. 35), Defendant Infotech Solutions (Doc. No. 38), and Defendant Pamela

Hunter (Doc. No. 41), with briefs in support (Doc. Nos. 36, 39, 43), briefs in opposition (Doc.

Nos. 48, 49, 51, 53) and reply briefs (Doc. Nos. 55, 56, 57, 58). The motions have been fully

briefed and are ripe for disposition. Since genuine issues of material fact remain, the Court will

deny the parties' motions for summary judgment.

## I.      FACTUAL BACKGROUND

Defendant Infotech Solutions, Inc., is a Delaware corporation operating in the

Commonwealth of Pennsylvania as Avysion IT and Avysion Healthcare Services.[1] (Doc. No. 40

¶ 4.) Avysion provides IT work and healthcare contract staffing. (Doc. No. 50 ¶ 1.) Under a

medical staffing contract between Avysion and the Commonwealth of Pennsylvania, Avysion

---

[1] Hereinafter, Defendant Infotech Solutions, Inc., and its agent Leonard Tokar will be
referred to jointly as "Avysion."

employees were placed with the Commonwealth Department of Public Welfare ("DPW") where they provided services for the Bureau of Fee for Services, Dental Prior Authorization Unit ("PAU"). (Doc. No. 40 ¶ 6; Doc. No. 50 ¶ 4-5.)

Plaintiff Kathryn Megonnell ("Megonnell") is a resident of Dauphin, Pennsylvania. (Doc. No. 40 ¶ 1.) Megonnell was hired by Avysion in January 2006 as a dental hygienist and placed with the DPW. (Doc. No. 50 ¶ 7; Doc. No. 37 ¶ 6.) Avysion pays wages for the placed healthcare resources, withholds their payroll taxes, and pays workers' compensation insurance. (Doc. No. 42 ¶ 6.) Megonnell and three other dental hygienists performed their duties with the PAU at the Cherrywood Building, on the grounds of the former Harrisburg State Hospital in Harrisburg, Pennsylvania. (Doc. No. 37 ¶¶ 10-11.) Defendant Pamela Hunter ("Hunter") is a resident of Mechanicsburg, Pennsylvania. (Doc. No. 40 ¶ 8.) Hunter is employed by the Commonwealth and is assigned to work for DPW as Supervisor for the Bureau of Program Integrity for the Provider Review Unit. (Id. ¶ 9.) Hunter directed Megonnell's work when she was assigned to the PAU. (Doc. No. 37 ¶ 13; Doc. No. 42 ¶ 12.) As such, Hunter approved Megonnell's leave requests and rated Megonnell's performance. (Doc. No. 50 ¶ 14.)

The crux of this case surrounds the events of June 18, 2007, in which Megonnell dealt with the fallout of her niece K.D.'s involuntary discharge from White Deer Run, a drug and alcohol rehabilitation center located in Allentown, Pennsylvania. (Doc. No. 37 ¶¶ 33(k), 39.)

K.D. is the daughter of Megonnell's sister and was 17 at the time of the alleged incident. (Doc. No. 37 ¶¶ 24-25.) Prior to October 2006, K.D. resided in Delaware, where she was a ward of that state. (Id. ¶ 26.) In October 2006, Janice and Robert Muza, residents of Dillsburg, Pennsylvania, were appointed as K.D.'s guardians. (Id. ¶ 29.) Janice Muza is Megonnell's

mother and K.D.'s grandmother. (Id.)

Shortly after K.D. began living at her grandmother's residence in Dillsburg, Megonnell and her husband learned that she was associating with negative influences. (Id. ¶ 31.) As a result, Megonnell sought to provide closer supervision for her niece. (Id. ¶ 32.) From approximately December 2006 to June 2007, K.D. spent the majority of her nights at the Megonnell residence. (Id. ¶ 33(a).) During that same time period, Megonnell provided her niece with a gym membership, hair appointments, payment for a college class and books, clothes, food, hunting gear, and day trips. (Doc. No. 50 ¶¶ 33(b), (d).) Megonnell and her husband included K.D. in family activities, taught K.D. about fitness and nutrition, and gave K.D. moral guidance and direction. (Doc. No. 37 ¶ 33.)

Megonnell and her husband persuaded K.D. to agree to residential admission at White Deer Run. (Id. ¶¶ 33(k), 39.) On or about June 11, 2007, Megonnell and her husband drove K.D. to White Deer Run, where K.D. was admitted and Megonnell was designated as K.D.'s family contact. (Id. ¶¶ 33(l), 39-40.)

Megonnell and her co-workers at PAU had social discussions during the workday and sometimes used such gatherings to discuss their personal lives. (Id. ¶ 34.) Megonnell shared information about K.D.'s issues with her co-workers, including Hunter. (Id. ¶¶ 33 (g)-(h), 35.)

Prior to June 18, 2007, Megonnell submitted an email request to Hunter for a day off to attend a family day at White Deer Run. (Doc. Nos. 37, 50 ¶ 43(a).) Hunter replied by email that Megonnell's request was granted. (Doc. No. 37 ¶ 43(b).)

On the morning of June 18, 2007, Megonnell received a call at work on her cell phone from White Deer Run advising her that K.D. was being involuntarily discharged and that

Megonnell would need to make arrangements to transport her from White Deer Run. (Id. ¶ 44.)

After receiving the phone call, Megonnell told Hunter that K.D. "just got kicked out of White Deer Run and I have to go pick her up." (Doc. No. 50 ¶ 47.)[2] Megonnell then told Hunter that she "need[ed] to go outside to make a quick phone call." (Id. ¶ 48.) Megonnell walked outside the Cherrywood Building around 9:00 A.M. (Doc. No. 37 ¶ 52.)

At that time, Megonnell began reaching out to various social service agencies to receive counsel from mental health and substance abuse professionals. She placed a phone call to Nora Campenella, a professional in DPW's Office for Mental Health & Substance Abuse Services ("OMHSAS"). (Doc. Nos. 37, 50 ¶ 53.) While walking across campus to OMHSAS, which is also located at the former Harrisburg State Hospital, Megonnell placed a call to York County Children and Youth. (Doc. Nos. 37, 50 ¶¶ 54-55.)

While Megonnell was away, Hunter sent emails to her manager and other DPW managers. (Doc. Nos. 37, 50 ¶ 57.) At 10:25 A.M., Hunter sent the following email:

> I just wanted to go on record and have it documented that Kate Megonnell left the building at 8:55 am to make a personal call on her cell phone to her husband, regarding a family crisis they are experiencing, and has not returned yet. One of my staff said Kate called them to say she went over to the building that Behavioral Health is working in. Beechmont I believe, to talk to a friend she has there regarding her family crisis. The friend is a behavioral health nurse. She is then having the friend help her talk with one of the psychiatrist working there to see if they can assist her with the family crisis that she is experiencing. She is still not back at her desk.

(Doc. No. 37 ¶ 57(a).) Hunter sent another email at 11:35 A.M.:

> [Megonnell] just came in at 11:20 and I called her in immediately. She was incredulous that I was mad!! She said she thought I understood that she had a

---

[2] Hunter avers that Megonnell only gave notice that K.D. was discharged from White Deer Run. (Doc. No. 47 ¶ 48.)

family emergency. However this morning when she indicated that she had the emergency she said she was going outside to call her husband, nothing was mentioned about her going home, or going to another building to talk with other people in order to seek assistance. . . .

(Id. ¶ 57(b).).

After her trip across campus to OMHSAS, Megonnell returned to the Cherrywood Building to retrieve her belongings. (Doc. Nos. 37, 50 ¶ 59.) When Megonnell arrived at the Cherrywood Building, Hunter directed Megonnell to Hunter's office. (Doc. No. 37 ¶ 60.) Hunter admitted that she "did not hide [her] anger" from Megonnell and was yelling at Megonnell. (Id. ¶ 64.) Co-workers who overheard the confrontation heard Hunter tell Megonnell that Megonnell had "too many family problems." (Doc. No. 50 ¶ 65.) Hunter directed Megonnell not to come in the following day. (Id. ¶ 69.) Megonnell protested to Hunter that she only needed to leave for that day to care for K.D. (Doc. No. 37 ¶ 70.)

After her confrontation with Hunter, Megonnell left work at approximately 11:20 A.M. and drove to White Deer Run to pick up her niece. (Doc. No. 50 ¶ 71.) That afternoon, Hunter phoned Tokar to advise him that DPW would "no longer need [Megonnell]" and was no longer in need of the position that Megonnell had occupied. (Doc. No. 37 ¶ 74.) Tokar is Avysion's Operations Manager. (Doc. No. 50 ¶ 12.) Hunter advised Tokar that PAU only needed three Avysion employees working in the unit. (Id. ¶ 75.) Hunter did not advise Tokar that Megonnell had been terminated, but rather that the "position that Ms. Megonnell held was eliminated." (Id. ¶ 76.) Specifically, Tokar has recounted that Hunter said

she needed to terminate a contract employee position, and she said it was for Kate Megonnell. She said that [Megonnell] had left the work site that morning for personal business and had also interacted with other DPW people for the personal business, and she said that [Megonnell] was sent home. She needed me to notify [Megonnell] or someone from our office that her position was terminated, and she

also asked that we have someone gather up her belongings.

(Doc. No. 40 ¶ 28.)

Megonnell did not have any further contact with any of the defendants until that evening, when she was called by Tokar who informed her that her position was terminated. (Doc. No. 40 ¶ 29; Doc. No. 50 ¶ 77.)  Megonnell advised Tokar that she had to leave the work site that day because her niece was being discharged from a facility.  (Doc. No. 37 ¶ 78.)

Meggonnell has recounted the discussion in her affidavit:

> Around 5 or 6 PM on June 18, 2007, after I returned to my residence from [White Deer Run], I received a call from Defendant Leonard Tokar of Avysion. Mr. Tokar stated that Ms. Hunter contacted him that day, and he asked me what happened.  Before I recounted the day's events, I told Mr. Tokar who [K.D.] was, her history, and the circumstances of her coming to stay with my husband and me. In providing a context for Mr. Tokar to understand the day's events, I told him about [K.D.'s] mental health diagnosis, her drug addiction history, and her institutionalization in Delaware; I also informed Mr. Tokar that even though my mother was [K.D.'s] guardian, she spent the majority of time in our custody.  I further recounted to Mr. Tokar the events that prompted my husband and I to cause [K.D.'s] admission to [White Deer Run] and about the phone call informing me that [K.D.] was involuntarily discharged.  I further described to Mr. Tokar that I had explained to Ms. Hunter of my need to respond to [K.D.'s] emergency and that I had confirmed with Ms. Hunter that I would be leaving work to get [K.D.], but that I needed to make some private calls before leaving.  Mr. Tokar stated that Ms. Hunter informed him that they no longer needed my services and expressed surprise at this since he had only heard glowing reports about me.  Mr. Tokar told me he had no other dental hygiene positions open for me at his time, but would keep me in mind if something opened up.

("Sworn Statement of Kathryn Megonnell," Doc. No. 37, Ex. 2 ¶¶ 100-107) (numbered paragraph breaks omitted).  During the phone conversation, Tokar instructed Megonnell that Avysion had no other dental hygienist positions available. (Doc. No. 37 ¶ 79.)

Prior to Tokar's phone call, Plaintiff did not discuss her niece, her niece's treatment and medical conditions, or any family problems with anyone at Avysion. (Doc. No. 40 ¶¶ 30-32.)

Nor did Plaintiff ever submit any documentation to Avysion requesting leave under the FMLA. (Id. ¶ 33.)

On December 28, 2007, Megonnell filed suit against Avysion, Tokar, and Hunter, alleging interference and retaliation claims under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et. seq. (Doc. No. 1.) On January 20, 2009, Megonnell, Hunter, and Avysion each filed motions for summary judgment. (Doc. Nos. 35, 38, and 41.) Briefs in opposition to the summary judgment motions were filed on February 13, 2009.[3]

## II.    STANDARD OF REVIEW

The parties have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an

---

[3] On March 27, 2009, the Court ordered that the case management deadlines should be stayed pending resolution of the cross-motions for summary judgment, a protective order filed by non-party White Deer Run (Doc. No. 26), and Avysion's motion for leave to file a cross-claim against Hunter (Doc. No. 29). (Doc. No. 60.) The Court addresses these two other outstanding motions in orders accompanying the present memorandum and order.

absence of a genuine issue of material fact. <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." <u>Berckeley Inv. Group. Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. <u>Celotex</u>, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252; <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

## III.  DISCUSSION

Whether summary judgment is appropriate for any of the parties in this case turns on different aspects of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 <u>et.</u> <u>seq</u>.  The FMLA states that, subject to specific certification requirements, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).

The FMLA proscribes interference with the Act's prescriptive rights and "[retaliation][4] based on the exercise of [those] rights." 29 U.S.C. § 2615(a); Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005). Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). In comparison, retaliation claims include the "use [of the] taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." Callison, 430 F.3d at 119 (citing 29 C.F.R. § 825.220(c)).

In order to exercise her rights under the FMLA, an employee is put under two affirmative duties. First, the employee "shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer." 29 U.S.C. § 2612(e)(2)(A). Second, the employee "shall provide the employer with not less than 30 days notice, before the date the leave is to begin, of the employee's intention to take leave." Id. § 2612(e)(2)(B). However, if "the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." Id. § 2612(e)(2)(B).

A. **Avysion's Motion for Summary Judgment**

Avysion argues that it is due summary judgment on two different grounds. First, Avysion argues that Megonnell failed to provide adequate notice to Avysion regarding her need to take leave under the FMLA. (Doc. No. 39 at 7-8.) Second, Avysion argues that Megonnell's

---

[4] Courts have used the term "discrimination" or "retaliation" interchangeably to refer to the second cause of action under the FMLA. See, e.g., Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) ("Additionally, the FMLA provides protection against discrimination based on the exercise of [rights under the FMLA], often referred to as the "discrimination" or "retaliation" provisions."). Since Megonnell's claims center around her being terminated for requesting FMLA leave, the Court will use the term retaliation for purposes of this memorandum.

claim for retaliation should fail since Avysion did not have any control over the elimination of Megonnell's position and no alternative placements with Avysion were currently available. (Id. at 19.) For purposes of its summary judgment motion, Avysion concedes that Megonnell was an eligible employee under the FMLA and, as such, would ordinarily have been entitled to leave under the FMLA. (Id. at 3 n.1.) The Court will address each of Avysion's arguments in turn.

>    i.    **A genuine issue of material fact exists as to whether Megonnell gave sufficient notice to Avysion.**

Avysion's first challenge to Megonnell's claim is that she did not provide Avysion with sufficient notice under the FMLA. The notice requirement under the FMLA is one of both timing and substance. Courts that have examined the notice issue have found it helpful to adopt a totality of the circumstances approach. See, e.g., Scobey v. Nucor Steel-Arkansas, 580 F.3d 781 (8th Cir. 2009) ("Because the [Department of Labor's] regulations state that the timeliness and adequacy of notice are standards dependent on the facts of each case, we must look at the totality of the surrounding circumstances to determine whether sufficient notice was given."); Tambash v. St. Bonaventure University, No. 99-cv-967, 2004 WL 2191566, *11 (W.D.N.Y. Sept. 24, 2004).

Under ordinary circumstances, an employee is required to give her employer 30 days notice of when she will need leave under the FMLA. See 29 U.S.C. § 2612(e)(1). However, if the 30-day notice is not practicable or if the need for leave is unforeseeable, a plaintiff must provide "notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.302(a); see also 29 U.S.C. §2612(e)(1). If an employee becomes aware of a need for FMLA leave less than 30 days in advance, the employee should notify her employer "either the same day or the next business day." 29 C.F.R. § 825.302(b).

Regarding the substantive requirements for notice, courts have noted that "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007) (quoting Manuel v. Westlake Polymers Corp., 66 F.3d 758, 764 (5th Cir.1995)). "It is clear that an employee need not give his employer a formal written request for anticipated leave. Simple verbal notification is sufficient . . . ." Id. In interpreting what constitutes sufficient notice, the Third Circuit has noted that a liberal construction is suggested by the text:

> In providing notice, the employee need not use any magic words. The critical question is how the information conveyed to the employer is reasonably interpreted. An employee who does not cite to the FMLA or provide the exact dates or duration of the leave requested nonetheless may have provided his employer with reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA.

Id.

Since Megonnell's emergency was unforeseeable, Megonnell was required to give Avysion notice of her intention to take leave "as soon as practicable." 29 U.S.C. §2612(e)(1). In this case, Avysion was not made aware of Megonnell's reason for leaving until her conversation with Tokar. (Doc. No. 37 ¶ 78.) At that time, Megonnell told Tokar that "she had to leave the work site that day because her niece was being discharged from a facility and she had to attend to that." (Id.) Although Megonnell's notice to Tokar came after the fact, Megonnell informed Tokar of the reason why she left work within hours of learning of her need for leave. Therefore, a reasonable jury could determine that Megonnell gave notice "as soon as practicable" and met the timeliness requirement for notice under 29 C.F.R. § 825.302(b). See 29 C.F.R. § 825.302(b) (stating that when an unforeseen need arises, an employee can notify her or his employer of a

11

need for leave either the same day or the next business day).

In addition, an issue of material fact remains over the substance of Megonnell's notice to Tokar, thereby barring summary judgment for either Megonnell or Avysion. An employee must give sufficient information to an employer to reasonably apprise the employer of the employee's request to take time off for a serious health condition. In the present case, the parties dispute the precise content of the notice given by Megonnell to Tokar, and whether Tokar was given sufficient information to alert him that Megonnell was requesting leave that would fall under the protections of the FMLA. Therefore, it will be for the trier of fact to resolve that dispute.

### ii. A genuine issue of material fact remains over whether Avysion could have reinstated Megonnell.

Avysion next argues that since it had no control over the elimination of Megonnell's position working for the Commonwealth, summary judgment should be granted for it on Megonnell's claim for retaliation. (Doc. No. 39 at 19.) Avysion argues that since Megonnell's position was terminated by the Commonwealth, and Avysion had no alternative positions available for her, Avysion had no ability to restore Megonnell to her position. (Id. at 20-21.)

Under § 825.220(c) of the FMLA, to be successful on a retaliation claim a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. See Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).

"Under the Price Waterhouse framework, when an FMLA plaintiff alleging unlawful termination presents direct evidence that his FMLA leave was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered the FMLA leave."

12

Conoshenti, 364 F.3d at 147 (quoting Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002)

(citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)) (alterations omitted).  The employer

is under a burden

> "[t]o convince the trier of fact that it is more likely than not that the decision
> would have been the same absent consideration of the illegitimate factor.  The
> employer need not isolate the sole cause for the decision; rather it must
> demonstrate that with the illegitimate factor removed from the calculus, sufficient
> business reasons would have induced it to take the same employment action. This
> evidentiary scheme essentially requires the employer to place the employee in the
> same position he or she would have occupied absent discrimination."

Id. at 147-48 (quoting Price Waterhouse, 490 U.S. at 276-77).  Thus, "an employer can avoid

liability under the FMLA if it can prove that it would not have retained an employee had the

employee not been on FMLA leave." Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541,

547 (4th Cir. 2006) (citations omitted); see also 29 C.F.R. § 825.216(a) ("An employee has no

greater right to reinstatement or to other benefits and conditions of employment than if the

employee had been continuously employed during the FMLA leave period. An employer must

be able to show that an employee would not otherwise have been employed at the time

reinstatement is requested in order to deny restoration to employment.").

In the present case, Avysion argues that since it is only a contracting agency, it could not

restore Megonnell to a position that had been removed by the Commonwealth.  According to

Avysion's logic, with the illegitimate factor of Megonnell's firing by Hunter removed from the

calculus, "sufficient business reasons would have induced [Avysion] to take the same

employment action." Conoshenti, 364 F.3d at 147-48 (citation removed).

In response, Megonnell acknowledges that the alleged absence of a position for her to

return to is Avysion's affirmative defense, yet argues that Avysion has failed to meet its burden

of proof. (Doc. No. 51 at 23.) Megonnell points to evidence that Avysion has filled dental hygienist positions for the Commonwealth since June 18, 2007, and argues that Megonnell's position could have been restored to her. (Id. at 24.) Megonnell further contends that the plain language of 29 C.F.R. § 825.106 compelled Avysion to work in tandem with Hunter and the Commonwealth to restore Megonnell's employment. (Id. at 23-24).

Under 29 C.F.R. § 825.106(e), "[j]ob restoration is the primary responsibility of the primary employer." 29 C.F.R. § 825.106(e). As the self-proclaimed primary employer of Megonnell (Doc. No. 39 at 13), Avysion fails to show how it met its responsibility under the federal regulations. Instead, questions remain over what steps, if any, Avysion took to restore Megonnell to employment. As a result, Avysion has not met its burden of showing that Megonnell "would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment." 29 C.F.R. § 825.216(a).

The Court finds that a genuine issue of material fact remains regarding Megonnell's retaliation claim against Avysion under the FMLA. Therefore, summary judgment is inappropriate.

### B. Hunter's Motion for Summary Judgment

The Court next turns to Hunter's motion for summary judgment. In her motion, Hunter argues that Megonnell cannot prove her claims under the FMLA for several reasons. First, Hunter argues that Megonnell's care for her niece does not qualify under the FMLA because Megonnell did not stand *in loco parentis* to K.D. (Doc. No. 43 at 6.) Second, Hunter argues that she had a legitimate, non-discriminatory reason for terminating Megonnell. (Id. at 7.) Third, Hunter asserts that Megonnell was not entitled to FMLA benefits because she did not provide

adequate notice of her need to take leave "as soon as practicable." (<u>Id.</u> at 9-10.)

       **i.**      **A genuine issue of material fact exists as to whether Megonnell stood**
                   ***in loco parentis*** **to K.D.**

The FMLA entitles an eligible employee to twelve work weeks of unpaid leave during

any twelve-month period if she needs the leave in order "to care for the spouse, or a son,

daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health

condition." 29 U.S.C. § 2612(a)(1)(C). "The term 'son or daughter' means a biological, adopted,

or foster child, a step child, legal ward, or a child of a person standing *in loco parentis*, who is . .

. under 18 years of age; or . . . 18 years of age or older and incapable of self-care because of a

mental or physical disability." 29 U.S.C. § 2611(12). "Persons who are 'in loco parentis' include

those with day-to-day responsibilities to care for and financially support a child or, in the case of

an employee, who had such responsibility for the employee when the employee was a child. A

biological or legal relationship is not necessary." 29 C.F.R. § 825.113(c)(3).

In addressing the term *in loco parentis* as used in the FMLA, this Court's sister court in

the District of Maryland has reviewed the meaning of that phrase under the common law:

> "The term 'in loco parentis,' according to its generally accepted common law
> meaning, refers to a person who has put himself in the situation of a lawful parent
> by assuming the obligations incident to the parental relation without going
> through the formalities necessary to legal adoption. It embodies the two ideas of
> assuming the parental status and discharging the parental duties." <u>Niewiadomski
> v. United States</u>, 159 F.2d 683, 686 (6th Cir.1947). Black's Law Dictionary
> defines the phrase "in loco parentis" as "[i]n the place of a parent; instead of a
> parent; charged, factitiously, with a parent's rights, duties, and responsibilities."
> Black's Law Dictionary 787 (6th ed.1990). . . .
>
> "The key in determining whether the relationship of in loco parentis is established
> is found in the intention of the person allegedly *in loco parentis* to assume the
> status of a parent toward the child." 28 Am. Jur. 2D Proof of Facts 545, § 2. The
> intent to assume such parental status can be inferred from the acts of the parties.
> <u>Id.</u> "Other factors which are considered in determining whether *in loco parentis*

15

status has been assumed are (1) the age of the child; (2) the degree to which the child is dependent on the person claiming to be standing in loco parentis; (3) the amount of support, if any, provided; and (4) the extent to which duties commonly associated with parenthood are exercised." <u>Id.</u>

<u>Dillon v. Maryland-National Capital Park and Planning</u>, 382 F. Supp. 2d 777, 786-787 (D. Md. 2005), <u>aff'd</u>, 258 Fed. Appx. 577 (4th Cir. 2007). Thus, whether an employee stands *in loco parentis* to a child is a fact issue dependent on multiple factors. <u>See e.g.</u>, <u>Dillon</u>, 382 F. Supp. 2d at 787 (finding plaintiff put forth enough evidence to create a genuine issue of material fact as to whether her grandmother stood *in loco parentis* to her); <u>Brehmer v. Xcel Energy, Inc.</u>, No. 06-3294, 2008 WL 3166265, at *7 (D. Minn. Aug. 4, 2008) (finding genuine issue of material fact on *in loco parentis* issue where employee helped his girlfriend's son eat, dress, get ready for bed, took child to doctor appointments and to school, went to child's softball games, and contributed more than half of child's financial support).

The Court finds that a genuine issue of material fact remains as to whether Megonnell stood *in loco parentis* to her niece K.D. There is evidence to suggest that from December 2006 to June 2007, K.D. spent the majority of her nights at the Megonnell residence. (Doc. No. 37 ¶ 33(a).) During that same time period, Megonnell provided her niece with a gym membership, hair appointments, payment for a college class and books, clothes, food, hunting gear, and day trips. (Doc. No. 50 ¶¶ 33(b), (d).) Megonnell and her husband included K.D. in family activities, taught K.D. about fitness and nutrition, and gave K.D. moral guidance and direction. (Doc. No. 37 ¶ 33.) Additionally, Megonnell was listed as the person of contact for K.D. during K.D.'s stay at White Deer Run. (<u>Id.</u> ¶ 33(l)).

In contrast, Hunter has elicited evidence that K.D.'s guardianship was granted to Megonnell's parents, the Muzas. (Doc. No. 42 ¶¶ 48, 50.) The Muzas provided K.D. with

clothing, food, and medical insurance. (Id. ¶¶ 55, 59.) K.D. stayed over at Megonell's home on some nights, but never lived with Megonnell full-time. (Id. ¶¶ 52-54, 57.) Furthermore, Megonnell never attempted to change guardianship and did not list K.D. as a dependent on her tax returns. (Doc. No. 43, at 4-7.)

A genuine issue of material fact remains over whether Megonnell stood *in loco parentis* to K.D. Accordingly, Hunter's motion for summary judgment will be denied.

>    ii.    **A genuine issue of material fact remains over whether Hunter had a legitimate non-discriminatory reason for terminating Megonnell.**

Hunter also argues that Megonnell has not met her burden of proof to prove a retaliation claim against Hunter since Hunter had legitimate, non-discriminatory reasons for terminating Megonnell's position. (Doc. No. 43 at 7, 9-10.) As discussed previously, under the Price Waterhouse framework, after an employee presents a prima facie case of discrimination, an employer may escape liability by proving that its termination of the employee "would have been the same absent consideration of the illegitimate factor." Conoshenti, 364 F.3d at 147 (quoting Price Waterhouse, 490 U.S. at 276).[5]

Specifically, Hunter states:

> On June 18, 2007, Megonnell disappeared from her work station for several hours after stating that she was leaving to make a quick phone call. Neither defendant Hunter, nor Megonnell's co-workers knew where Megonnell had gone. The Bureau of Fee for Service is under quota restraints and processing claims in line with those quotas is very important. Without Megonnell, others needed to pick up her share of the work. After returning to the office following her greater than two hour absence, Megonnell became insubordinate with defendant Hunter raising her voice, hovering over Hunter's desk, and pounding on the desk. Prior to that time, Hunter had observed that Megonnell had attendance issues as well as

---

[5] The Court notes that there remain genuine issues of material fact as to whether Megonnell will be able to establish a prima facie case under the FMLA.

> production issues. Megonnell admittedly socialized in the office and Hunter
> indicated that too much socializing went on. In light of these reasons, and
> because it was determined that there was no need for four hygienist positions in
> June 2007, Megonnell's position was terminated at the Commonwealth location.

(Doc. No. 43 at 7-8) (citations omitted). In further support of her argument that Megonnell's

position was unnecessary, Hunter points out that the Commonwealth has since maintained three

hygienist positions instead of four. (Id. at 8.)

The Court finds Hunter's argument unpersuasive in that questions of material fact remain

as to whether Hunter fired Megonnell for legitimate non-discriminatory reasons. According to

Hunter's 10:25 A.M. email to her superiors, Hunter indicated that she was aware that Megonnell

had left to call her husband about a family emergency and that Megonnell's co-workers had

made Hunter aware that Megonnell was meeting with a behavioral health nurse across campus.

(See Doc. No. 37 ¶ 57(a).) Furthermore, Hunter's argument that Megonnell's absence, which

caused other co-workers to have to "pick up her share of the work," was the cause for

Megonnell's firing undercuts the very purpose of the FMLA. The FMLA is designed to afford

an employee leave when she is dealing with a serious health condition affecting her family

members. If an employer were allowed to argue that its non-discriminatory reason for

termination was that the employee's absence interrupted the employer's daily production

schedule, the protection of the FMLA would be virtually non-existent. See also Erdman v.

Nationwide Ins. Co., 582 F.3d 500, 508 (3d Cir. 2009) ("[I]t would be patently absurd if an

employer who wished to punish an employee for taking FMLA leave could avoid liability simply

by firing the employee before the leave begins.")

Therefore, since there are genuine issues of material fact regarding Hunter's reason for

firing Megonnell, summary judgment is inappropriate.

### iii.    A genuine issue of material fact exists over whether Megonnell gave Hunter sufficient notice under the FMLA.

Finally, Hunter argues that summary judgment is appropriate because Megonnell did not give Hunter the requisite notice for her need to take leave under the FMLA. (Doc. No. 43 at 10.) In short, Hunter challenges the substance of the notice that Megonnell gave to Hunter.  Hunter acknowledges that Megonnell "did go to Hunter's office on June 18, 2007, and [told] her that she might need leave that day to pick up her niece who was, as she put it, 'just kicked out' of a residential facility. . . ." (Id.)  Yet, Hunter argues that this notice was inadequate since "there is no evidence that Hunter had any belief or knowledge that K.D. was a 'child' within the meaning of the FMLA" or that "K.D. had a serious health condition."  (Id.)

Contrary to Hunter's arguments, however, Megonnell has presented sufficient evidence to put forward a genuine issue of material fact regarding whether Megonnell gave Hunter sufficient notice that she was requesting FMLA leave.  Megonnell has presented evidence that her co-workers, including Hunter, were aware of the issues surrounding her relationship with her niece K.D.  It is uncontroverted that Megonnell sent Hunter an email requesting leave to visit her niece at White Deer Run. (Doc. No. 37 ¶ 43(a).)  Hunter acknowledges on the morning of June 18, 2007, Megonnell told Hunter that her niece had been discharged from the program at White Deer Run and that Megonnell would need to leave. (Doc. No. 43 at 10.)

Furthermore, Hunter's emails to her superiors undermine her denials that she was aware of the serious nature of Megonnell's request.  The email sent by Hunter at 10:25 A.M. acknowledges that Hunter "wanted to go on record and have it documented that Kate Megonnell left the building at 8:55 am to make a personal call on her cell phone to her husband, *regarding a family crisis* they are experiencing, and has not returned yet."  (Doc. No. 37 ¶ 57(a)) (emphasis

added). Hunter's email also notes that one of Megonnell's co-workers relayed the information to Hunter that Megonnell was consulting with a friend who was a "behavioral health nurse" who was helping Megonnell "with one of the psychiatrist [sic] working there to see if they can assist her with the family crisis . . . ." (Id.)

Such evidence works against Hunter's claims that she did not have notice that Megonnell's niece qualified as a child under the FMLA and that she was unaware of K.D.'s health condition. At the least, a question of material fact is raised that must be determined by the fact-finder. Since a question of material fact remains as to whether Megonnell gave Hunter sufficient notice for purposes of the FMLA, summary judgment is inappropriate. Accordingly, Hunter's motion for summary judgment will be denied.

### C. Megonnell's Motion for Summary Judgment

Finally, the Court turns to the summary judgment motion filed by Megonnell. In her summary judgment brief, Megonnell argues that the undisputed material facts establish that she has proven her interference and retaliation claims under the FMLA. (Doc. No. 36 at 3.) Specifically, Megonnell argues that she undisputedly stood *in loco parentis* to K.D., that K.D. had a serious health condition, and that Megonnell gave her employer appropriate notice. (Id. at 7-10.)

However, as with the defendants' motions for summary judgment, genuine issues of material fact remain over these key issues. There is a genuine issue of whether Megonnell stood *in loco parentis* to K.D. that will be for the factfinder to determine. See Part III.B.i, supra. Likewise, whether Megonnell gave appropriate notice to either Avysion or Hunter remains a genuine issue of material fact. See Parts III.A.i, III.B.iii, supra.

Therefore, since Megonnell is unable to show that there is no genuine issue of material fact, her summary judgment motion is due to be denied.

**IV.     CONCLUSION**

None of the parties have convinced the Court that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Therefore, summary judgment is inappropriate at this time and will be denied as to all claims.  An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **KATHRYN MEGONNELL,** | : | |
| | : | |
| **Plaintiff** | : | **Civil Action No. 1:07-cv-02339** |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **INFOTECH SOLUTIONS, INC. t/d/b/a** | : | |
| **AVYSION IT and/or AVYSION** | : | |
| **HEALTHCARE SERVICES, PAMELA** | : | |
| **HUNTER AND LEONARD TOKAR,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, this 18th day of November 2009, upon consideration of the parties' motions

for summary judgment (Doc. Nos. 35, 38, 41), it is hereby ordered that the motions are

**DENIED**.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
Dated: November 18, 2009